KELLEY, Exr., Appellant and Cross–Appellee,

v.

FERRARO et al., Appellees and Cross–Appellants.

[Cite as *Kelley v. Ferraro,* 188 Ohio App.3d 734, 2010-Ohio-2771.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 92446

Decided June 17, 2010.

William T. Wuliger, for appellant and cross-appellee.

Wilcox & Garofoli Co., L.P.A., John R. Climaco, David M. Cuppage, Scott D. Simpkins, and Climaco, Lefkowitz, Peca, for appellees and cross-appellants.

CHRISTINE T. McMONAGLE, Judge.

{¶ 1} Plaintiff-appellant and cross-appellee, Lynn Arko Kelley, individually and as executor of the estate of Michael Vincent Kelley, appeals from the trial court's judgment, rendered after a jury verdict, awarding her $4.22 million against defendant-appellee and cross-appellant Kelley & Ferraro, L.L.P. ("K & F"), and directing a verdict in favor of defendant-appellee and cross-appellant James Ferraro.

{¶ 2} In eight assignments of error, Kelley asserts that numerous errors occurred before, during, and after trial. In three assignments of error, Ferraro and K & F likewise contend that there were errors before, during, and after trial.

## I. Background

{¶ 3} This case arises from the death of Michael Kelley, one of the founding partners of K & F, an Ohio limited-liability law partnership specializing in plaintiffs' asbestos litigation. The firm was formed in 1997 by a written partnership agreement between Michael Kelley and Ferraro, a Florida lawyer who owned and operated his own asbestos law firm. Ferraro's contribution to K & F was to guarantee a $1.5 million line of credit that was serviced entirely by K & F; pursuant to the agreement, he devoted all of his time to his Florida law firm. K & F was extraordinarily successful; from 1997 through 2005, Michael Kelley and Ferraro each received $44 million in compensation from the firm—$11 million each in 2005 alone.

{¶ 4} Michael Kelley died of a heart attack on January 2, 2006. Kelley, Michael's widow and executor of his estate, commenced this litigation in April

2006. Her second amended complaint alleged claims, as numbered counts in the complaint, for (1) dissolution according to the agreement, (2) winding up according to the agreement, and (3) an accounting of K & F according to the agreement, (4) Ferraro's breach of the agreement, (5) Ferraro and K & F's breach of an oral contract between Kelley and K & F regarding Kelley's employment with K & F, (6) conversion by Ferraro and K & F of money and assets belonging to the estate, (7) fraud by Ferraro relating to promises he made to Kelley after Michael's death, (8) promissory estoppel relating to the promises, (9) unjust enrichment of Ferraro and K & F based on trademark infringement through K & F's continued use of the name "Kelley" after Michael's death, (10) breach of fiduciary duty by Ferraro and K & F, (11) unjust enrichment arising out of Ferraro's failure to dissolve his Florida law firm after Michael's death and devote all his time to K & F per the agreement, (12) injunctive relief, and (13) a constructive trust.

{¶ 5} Counts 14 through 17 of the second amended complaint alleged claims related to Ferraro's conduct with respect to the Las Vegas Gladiators arena football team, in which Michael Kelley invested $2.8 million before his death. These claims were for (14) violation of R.C. 1707.07, (15) breach of fiduciary duty, (16) breach of contract, and (17) conversion of estate assets through Ferraro's management and control of the team.

{¶ 6} Ferraro and K & F filed an answer asserting numerous affirmative defenses to the second amended complaint; they also filed a counterclaim for declaratory judgment. They contemporaneously filed a motion to dismiss or for summary judgment regarding all of Kelley's claims.

{¶ 7} Kelley filed a motion to dismiss appellees' counterclaim for declaratory judgment and later filed a motion for partial summary judgment, seeking summary judgment regarding Ferraro's liability on her contract claims relating to the agreement and her claims regarding the Gladiators football team. The trial court did not rule on any of these motions.

{¶ 8} A jury trial commenced in March 2008, as to all claims and counterclaims. The trial court subsequently granted appellees' motion for a directed verdict in favor of Ferraro on all counts. The trial court also granted a directed verdict for K & F on all counts except Count 4, which alleged a claim for breach of the agreement *against Ferraro*. The court converted that claim to a quasi-contract/unjust-enrichment claim, and the jury returned a verdict in favor of Kelley and against K & F in the amount of $4.22 million on this claim.

{¶ 9} K & F then filed a motion for judgment notwithstanding the verdict or for remittitur, while Kelley filed a motion for a new trial as well as a motion for costs and prejudgment interest. While these motions were pending, Kelley filed an affidavit of disqualification with the Ohio Supreme Court seeking to disqualify

the trial judge from further proceedings on this matter and several other related matters; the trial judge subsequently voluntarily withdrew from the case. The matter was reassigned and thereafter the new judge denied all pending posttrial motions.

## II. Kelley's Appeal

### A. Claims Relating to the Agreement

{¶ 10} Kelley's motion for partial summary judgment sought summary judgment regarding Ferraro's liability on her claims relating to the agreement and the Gladiators football team. The trial court did not rule on her motion; hence we presume it was denied. *Temple v. Fence One, Inc.,* Cuyahoga App. No. 85703, 2005-Ohio-6628, 2005 WL 3436354, ¶ 27.

{¶ 11} In her first assignment of error, Kelley contends that the trial court erred in not granting summary judgment or a directed verdict in her favor on her claims relating to the agreement.

{¶ 12} Civ.R. 56(C) provides that summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267. We review the trial court's judgment de novo, using the same standard that the trial court applies under Civ.R. 56(C). *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

{¶ 13} In her motion for partial summary judgment, Kelley argued that Michael Kelley's death statutorily dissolved the partnership and triggered Ferraro's duty to wind up K & F's affairs under former R.C. 1775.30(D),[1] which provided that the death of a partner dissolved a partnership. Ferraro and K & F responded that dissolution of K & F was not statutorily required, because partners may waive those requirements, which they claimed the agreement did.

{¶ 14} The agreement did not waive the requirements of R.C. 1775.30(D), however. As discussed below, the plain language of the agreement required Ferraro to treat Michael Kelley's death as an event triggering the dissolution and winding up of the K & F partnership. Thus, Ferraro was statutorily and contractually required to dissolve K & F, wind up its affairs, and provide Kelley with an accounting and settlement of the estate's interest.

---

1. Repealed by 2008 Sub.H.B. No. 332, Section 3, effective January 1, 2010.

{¶ 15} The interpretation of a written contract is a matter of law for the court. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. The purpose of construing contracts is to effectuate the intent of the parties. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 132, 31 OBR 289, 509 N.E.2d 411. Courts presume that the parties expressed their intentions in the language they chose to employ in the contract. Id.; *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499. Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. *Alexander,* at paragraph two of the syllabus.

{¶ 16} Where contract terms are clear and unambiguous, the court cannot, in effect, create a new contract by finding an intent not expressed in the clear language employed by the parties. *Brandon/Wiant Co. v. Teamor* (1998), 125 Ohio App.3d 442, 447, 708 N.E.2d 1024. "A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Kelly,* 31 Ohio St.3d at 132, 31 OBR 289, 509 N.E.2d 411. A contract does not become ambiguous because its operation may work a hardship upon one party. *Fultz & Thatcher v. Burrows Group Corp.,* 12th Dist. No. CA2005-11-126, 2006-Ohio-7041, 2006 WL 3833971, ¶ 29, citing *Ohio Crane Co. v. Hicks* (1924), 110 Ohio St. 168, 172, 143 N.E. 388. If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. *Inland Refuse Transfer Co. v. Browning–Ferris Ind. of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271.

{¶ 17} Sections 1 and 11 of the agreement addressed issues governing the dissolution and winding up of the K & F law firm. In particular, the agreement provided:

{¶ 18} "1.5 Term. The term of the Partnership shall commence on the Effective Date hereof and shall continue until the winding up and dissolution of the Partnership is completed.

{¶ 19} " * * *

{¶ 20} "11.1 Liquidating Events. The Partnership shall commence winding up and dissolution upon the first to occur of any of the following ('Liquidating Events'):

{¶ 21} "(a) The Bankruptcy of a Partner;

{¶ 22} "(b) The decision of the Partners to wind up, liquidate and dissolve the Partnership;

{¶ 23} "(c) The happening of any other event that makes it unlawful or impossible to carry on the business of the Partnership;

{¶ 24} *"(d) Any event which causes there to be only one (1) Partner;* or

{¶ 25} "(e) The giving by a Partner of notice of his intent to withdraw from the Partnership." (Emphasis added.)

{¶ 26} The language of subsection (d) is abundantly clear and unambiguous. Under Section 11.1(d), "any event" that caused there to be only one partner of K & F required dissolution and winding up of the firm. An "event" is "something that happens." Webster's Third New International Dictionary (1986) 788. As the death of Michael Kelley was "something that happen[ed]" that caused there to be only one partner of K & F, Ferraro, as the remaining partner, was obligated under the agreement to dissolve and wind up K & F.[2]

{¶ 27} In their motion to dismiss or for summary judgment and in their brief in opposition to Kelley's motion for partial summary judgment, Ferraro and K & F argued that Michael Kelley's death did not require dissolution and winding up of the firm, because Section 11 of the agreement intentionally did not include death as a liquidating event. They argued that earlier drafts of the agreement, which had included provisions regarding how profits were to be divided upon the death of a partner, were evidence that the final agreement, which did not include death as a "Liquidating Event," was intentionally silent as to the death of a partner and that Section 11.4, regarding how fees were to be distributed upon the dissolution and winding up of the firm, was not meant to be a method of valuation upon the death of a partner. They argued further that a partner's death was not a liquidating event under the agreement, because Michael Kelley had told various persons that he wanted the firm to continue after his death and had assured attorneys at K & F that the firm would continue after his death.

{¶ 28} But such parol evidence is not appropriately considered in this case. "The Parol Evidence Rule prohibits the admission of testimony regarding prior or contemporaneous oral agreements which contradict or vary the terms of written agreements. However, where there is ambiguity in a contract, parol evidence may be admitted to explain such ambiguities. The main issue in cases involving the parol evidence rule is whether the parties intended that a written

---

2. Section 11.2, regarding "Winding Up," provided: "Upon the occurrence of a Liquidating Event, the Partnership shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Partners, and no Partner shall take any action that is inconsistent with, or not necessary to or appropriate for, winding up the Partnership's business and affairs." Section 11.2 further provided that "all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Property has been distributed pursuant to this Agreement and the Partnership has been terminated."

agreement constitute the final and complete expression of the agreement and, if so, the parol evidence rule would apply." (Citations omitted.) *Children's House Early Learning Ctr., Inc. v. McNamara*, 8th Dist. No. 83300, 2004-Ohio-1904, 2004 WL 795911, ¶ 9.

{¶ 29} Here, there is no issue about whether the parties intended the agreement to be the final and complete expression of their agreement. Section 12.13 of the agreement provided "This Agreement constitutes the entire agreement among the Partners relating to the matters contained herein." This integration clause expressly provided that the agreement was the entire agreement of partnership between Michael Kelley and Ferraro regarding K & F, including an agreement as to what events would require the dissolution and winding up of K & F (one of "the matters contained herein"). To consider parol evidence regarding the agreement, which contained an integration clause by which Michael Kelley and Ferraro expressly limited themselves to the written agreement, would accord the clause no meaning. " 'When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.' " *Ed Schory & Sons v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 440, 662 N.E.2d 1074, quoting 3 Corbin, Corbin on Contracts (1960) 357, Section 573.

{¶ 30} Further, there is no ambiguity about the language of Section 11.1 that would require parol evidence to explain its terms. See *Olmsted Manor Skilled Nursing Ctr., Ltd. v. Olmsted Manor, Ltd.*, 8th Dist. No. 80962, 2002-Ohio-5457, 2002 WL 31269815, ¶ 20 (parol evidence may be used to establish meaning of written terms of fully integrated contract only where judge finds ambiguity in written terms). The language is clear: "any event" that caused there to be only one partner of K & F required dissolution and winding up of the firm. Michael Kelley's death was obviously an event that caused there to be only one partner at K & F, thereby triggering Ferraro's duty to dissolve and wind up the firm.

{¶ 31} The evidence established that upon Michael Kelley's death, Ferraro was the sole remaining "partner" of K & F, as that term was defined in the agreement. The definitional section of the agreement provided:

{¶ 32} "1.10 Definitions. Capitalized words and phrases used in this Agreement have the following meanings:

{¶ 33} "* * *

{¶ 34} "(j) '*Partners*' means *those Persons executing this Agreement as Partners.* 'Partner' means any one of the Partners." (Emphasis added.)

{¶ 35} The evidence was undisputed that only two persons—Michael Kelley and Ferraro—ever signed the partnership agreement. Although other individuals were named as salaried, nonequity partners in K & F prior to Michael Kelley's death, Ferraro admitted that none of them ever signed the partnership agreement as partners or otherwise and that none of them ever signed any other document that adopted the partnership agreement.

{¶ 36} Moreover, although the agreement created the possibility that other persons could be brought in later as "partners" in the K & F firm, Section 1.11 of the agreement provided: "No Person shall be admitted to the Partnership as a Partner without the written consent of both Partners." No such written consent was ever given, as Ferraro admitted. Hence, despite Ferraro and K & F's argument otherwise, there were only two "partners" of K & F, as defined by the agreement, at the time of Michael Kelley's death.

{¶ 37} We likewise reject Ferraro and K & F's argument that the estate, as the representative of Michael Kelley, was estopped from enforcing the agreement because Michael Kelley waived the requirements of the agreement by admitting salaried, nonequity partners to K & F without their signing the agreement. This argument ignores the plain language of Section 12.13 of the agreement, which precluded any changes to the agreement unless in writing:

{¶ 38} "12.13. Amendments; No Assignment. This Agreement constitutes the entire agreement among the Partners relating to the matters contained herein. *No change in, amendment or modification to, or waiver of any of the terms and conditions of this Agreement shall be binding upon any Partners* [sic] *unless approved by all Partners in writing.* This Agreement may not be assigned by the parties hereto unless approved by all Partners in writing." (Emphasis added.)

{¶ 39} Ohio law is very clear that a contract that expressly provides that it may not be amended, modified, or waived except in writing executed by the parties is not subject to oral modification. *Freeman–McCown v. Cuyahoga Metro. Hous. Auth.* (Oct. 26, 2000), 8th Dist. Nos. 77182 and 77380, 2000 WL 1594090; *Rosepark Properties, Ltd. v. Buess,* 167 Ohio App.3d 366, 2006-Ohio-3109, 855 N.E.2d 140, ¶ 38; *Chiaverini, Inc. v. Jacobs,* 6th Dist. No. L–06–1360, 2007-Ohio-2394, 2007 WL 1452839, ¶ 24; *Fultz & Thatcher,* 2006-Ohio-7041, at ¶ 17. It is undisputed that there was no such written modification here.

{¶ 40} Having concluded that Michael Kelley's death required Ferraro to dissolve and wind up K & F under the agreement, we next determine whether the agreement provided a method for settlement and disposition of the estate's interest. Under former R.C. 1779.08, when the partnership agreement in force at the death of a partner provided for a method of settlement and distribution of

the deceased partner's interest different from that set forth in R.C. 1779.01 et seq., "such interest shall be settled and disposed of in accordance with such article."

{¶ 41} As the representative of Michael Kelley's estate, Kelley sought enforcement of Section 11.4 of the agreement, which required the continuing partner to compensate the noncontinuing partner for a percentage of the revenues generated by processing existing client files upon the dissolution and winding up of the firm. Specifically, Section 11.4 stated:

{¶ 42} "In connection with the winding up and liquidation of the Partnership, the Partner who originated a particular client shall be entitled to the client's files unless the client requests that a different disposition be made of his or her files. As hereinafter set forth, both Partners will receive compensation with respect to all such client files. The Partner who continues to handle a case(s) (the 'Continuing Partner') and the Partner who will not further handle a case(s) (the 'Non–Continuing Partner') will share in the final settlement of any and all such case(s) in the manner hereinafter described. The Non–Continuing Partner shall receive payment(s) from the Continuing Partner within thirty (30) days after the date(s) on which settlement funds are received by the Continuing Partner in connection with any such case(s) after deducting costs attributable to the case(s) as follows:

forty percent (40%) × (Fees attributable to a particular case(s) *minus* costs advanced regarding such case(s))

equals Fee to Non-Continuing Partner"

{¶ 43} In their motion to dismiss or for summary judgment, and their brief in opposition to Kelley's motion for partial summary judgment, Ferraro and K & F argued that Kelley could not enforce this provision of the agreement for several reasons and, hence, that the court should deny her motion for partial summary judgment and grant their motion for dismissal or summary judgment regarding her contract claims.

{¶ 44} Relying on Ferraro's deposition testimony, they first contended that Section 11.4 was never intended by Michael Kelley and Ferraro to apply to the death of a partner but was intended only to create a severe financial disincentive for Michael Kelley to leave the partnership and take the majority of the files with him. We reiterate our earlier discussion regarding parol evidence. "Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions. Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence. There can be no implied covenant in a contract in relation to any matter that is

specifically covered by the written terms of the contract." (Citations omitted.) *Aultman Hosp. Assn. v. Hosp. Care Corp.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920. Because Section 11.4 expressly provided for how fees should be divided upon all situations in which there was a winding up and liquidation of the partnership and did not limit its application solely to Michael Kelley's voluntary withdrawal from the firm, it is applicable here.

{¶ 45} Ferraro and K & F next argued that Section 11.4 was unenforceable because Michael Kelley and Ferraro had orally amended the agreement during a conversation over drinks at the St. Regis Hotel in New York City in 2002. The purported amendment allegedly provided that in the event of the death of either of them, the deceased partner's estate would receive 50 percent of K & F's net profit for the year of the death, 40 percent for the first year after death, 30 percent for the second year after death, and finally, 20 percent for the third year after death (the alleged "50/40/30/20 agreement").

{¶ 46} Again, we refer to the unambiguous terms of the agreement. Section 12.13 expressly provided that the agreement constituted the entire agreement of the parties and, further, that its terms could not be changed, amended, modified, or waived except in writing executed by the partners. Although it is true, as argued by Ferraro and K & F, that a written contract can be orally amended, as noted earlier, Ohio law is clear that a contract that expressly provides that it may not be amended, modified, or waived except in writing executed by the parties to the agreement is not subject to an oral modification or waiver claim as a matter of law. Ferraro testified that the agreement was never amended in writing to include the alleged St. Regis Hotel amendment; hence, the 50/40/30/20 agreement is irrelevant to our discussion.

{¶ 47} Lastly, Ferraro and K & F argued that Section 11.4 of the agreement was unenforceable because allowing the estate to share in the contingency fees as contemplated by Section 11.4 would violate Ohio Rules of Professional Conduct 5.4(a)(1) and 5.4(d)(1). Prof.Cond.R. 5.4 states:

{¶ 48} "(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except in any of the following circumstances:

{¶ 49} "(1) an agreement by a lawyer with the lawyer's firm, partner, or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

{¶ 50} "* * *

{¶ 51} "(d) A lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if any of the following applies:

{¶ 52} "(1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration."

{¶ 53} Ferraro and K & F contended that allowing the estate to receive contingency fees as set forth in Section 11.4 of the agreement would violate Prof.Cond.R. 5.4(a)(1) and 5.4(d)(1) because (1) the estate is not a lawyer and courts have long refused to enforce fee-sharing agreements with nonlawyers and (2) the estate would own an interest in the firm beyond a reasonable period of time. Neither argument is persuasive.

{¶ 54} First, the very rules that Ferraro and K & F contend would be violated if K & F were required to pay fees to the estate indicate that a law firm may indeed properly share fees with a deceased lawyer's estate. EC 3–8 of the Ohio Code of Professional Responsibility offers the same guidance, stating: "Because a lawyer should not aid or encourage a nonlawyer to practice law, a lawyer should not practice law in association with a nonlawyer or otherwise share legal fees with a nonlawyer. This does not mean, however, that pecuniary value of the interest of a deceased lawyer in his or her firm or practice may not be paid to his estate or specified persons, such as a surviving spouse or heirs through the sale of a law practice or otherwise." The disingenuousness of defendants' argument is demonstrated by their assertion that they would be willing to pay the estate under the 50/40/30/20 agreement, but not under the written agreement. Under either scenario, the estate is a nonlawyer.

{¶ 55} Ohio law is clear that the legal representative of a decedent stands in the shoes of that decedent with respect to his financial and commercial rights and obligations and that a partner's legal interest in the partnership continues through his estate after his death. See, e.g., *Hosfelt v. Miller* (Nov. 22, 2000), 7th Dist. No. 97–JE–50, 2000 WL 1741909, citing *Santa v. Ohio Dept. of Human Serv.* (2000), 136 Ohio App.3d 190, 736 N.E.2d 86; *Hopper v. Nicholas* (1922), 106 Ohio St. 292, 302, 140 N.E. 186; *Hill v. Hill* (Feb. 21, 2002), 10th Dist. No. 01AP–716, 2002 WL 243294. Ferraro agreed, upon the occurrence of a liquidating event, to pay Michael Kelley as set forth in Section 11.4 of the agreement in connection with the winding up and liquidation of K & F. The estate has a legal interest in Michael Kelley's partnership interest; therefore, as the representative of the estate, Kelley may enforce Section 11.4 of the agreement.

{¶ 56} Further, we disagree with defendants' bare assertion that any period longer than the four years contemplated by the 50/40/30/20 agreement would not, as a matter of law, be reasonable. Reasonableness in the law is a fluid standard dependent upon all the facts and circumstances of the case. We find nothing in this case to indicate that the business of K & F could not be wound up in a

reasonable period of time, even though the period could, under the facts and circumstances, be longer than four years.

{¶ 57} Accordingly, we hold that the trial court erred in denying Kelley's motion for partial summary judgment regarding Ferraro's liability under the agreement relative to the affairs of K & F. Because Ferraro did not dissolve the partnership and wind up its affairs, he breached his contractual and fiduciary duties to wind up K & F's affairs upon the dissolution of the partnership, which occurred upon Michael Kelley's death. *Simandl v. Simandl* (1982), 3 Ohio App.3d 357, 361, 3 OBR 414, 445 N.E.2d 734, citing *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 63 O.O.2d 262, 297 N.E.2d 113. Therefore, the court should have granted summary judgment to Kelley with respect to Ferraro's liability on Counts 1, 2, 3, 4, and 10 of her second amended complaint.[3]

{¶ 58} Moreover, even if there were no error in the trial court's denial of summary judgment, this verdict could not stand. Count 4 of Kelley's second amended complaint alleged breach of the agreement only against Ferraro and not K & F. Hence, the trial court erred in allowing the jury to consider this count as against K & F. Insofar as the verdict was returned against a party against whom no claim was asserted, the verdict is void.

## B. Kelley's Other Claims

{¶ 59} In her second assignment of error, Kelley argues that the trial court erred in not granting the estate summary judgment or a directed verdict at trial on her claims regarding the Gladiators football team, her conversion claim, and her requests for injunctive relief, appointment of a receiver, and imposition of a constructive trust.

## 1. Claims Regarding the Gladiators Football Team

{¶ 60} In Counts 14, 15, 16, and 17 of her second amended complaint, Kelley alleged that Ferraro induced Michael Kelley to invest $2.8 million in the Las Vegas Gladiators football franchise (i.e., Gladiators, Inc.) by misrepresenting its

---

3. Despite the trial court's ruling during trial that the agreement was void because Ferraro was not licensed to practice in Ohio when he executed the agreement in 1997, we specifically find that the agreement is valid and enforceable. The Ohio Supreme Court has addressed this issue and recognized that "[l]awyers authorized to practice law in different jurisdictions may form partnerships and use the same firm name in each jurisdiction so long as the firm letterhead and other permissible listings of members and associates 'make clear the jurisdictional limitations' on those attorneys." *Disciplinary Counsel v. Pavlik* (2000), 89 Ohio St.3d 458, 732 N.E.2d 985. There was no evidence that K & F did not respect the jurisdictional limitations of Ferraro and Michael Kelley. Accordingly, Ferraro could, and did, enter into a valid partnership agreement with Michael Kelley in 1997, despite the fact that he was not licensed to practice law in Ohio at that time.

value, and then wrongfully demanded additional cash investments from Michael Kelley and, after his death, from the estate. According to Kelley, when the estate refused to honor Ferraro's demands for additional cash, Ferraro unilaterally declared the estate's entire interest in the Las Vegas Gladiators forfeited, folded the Las Vegas Gladiators franchise, and moved the team to Cleveland as a new business entity solely owned by him. Kelley claimed that Ferraro violated R.C. 1707.07 by selling unregistered securities in Gladiators, Inc., to Michael Kelley. She further claimed that Ferraro breached his fiduciary duties, converted estate assets, and usurped a corporate opportunity by unilaterally forfeiting the estate's interest in the Gladiators, alienating the Las Vegas Gladiators' assets, and taking the Cleveland Gladiators as his exclusive property.

{¶ 61} In response to Kelley's motion for summary judgment on these claims, Ferraro asserted that Kelley's securities claims were barred by the two-year statute of limitations set forth in R.C. 1707.41(D) and 1707.43(B) and that the transaction was exempt from Ohio's securities regulations under R.C. 1707.431(B). He also asserted that Michael Kelley was aware prior to his investment in the Las Vegas Gladiators that he would be responsible for additional cash contributions, and that in 2003, 2004, and 2005, he contributed an additional $1.2 million to the Gladiators upon Ferraro's demands. Ferraro claimed that Michael Kelley's cash contributions waived the estate's claimed right to maintain Michael Kelley's interest in the Gladiators without additional cash contributions. In addition, Ferraro claimed that Kelley regularly received tax returns and financial statements relating to the Gladiators, disproving the estate's claim that Michael Kelley did not know the true value of the team.

{¶ 62} The trial court did not rule on Kelley's motion for partial summary judgment but, at trial, granted defendants' motion for directed verdict regarding Kelley's claims relating to the Gladiators. The court found that Michael Kelley's purchase of an interest in the Gladiators was exempt from Ohio securities regulations and Kelley's claims were barred by the applicable statute of limitations. It further found that Kelley had not produced any evidence to support her remaining claims relating to the Gladiators.

{¶ 63} On appeal, Kelley does not challenge the trial court's rulings that her securities claims were barred by the statute of limitations and that Michael Kelley's purchase of his interest in the Gladiators was an exempt transaction; Kelley has therefore waived any alleged error regarding these rulings.

{¶ 64} With respect to Kelley's other claims regarding the Gladiators, the trial court properly granted a directed verdict to defendants. Civ.R. 50 sets forth the standard for granting a motion for a directed verdict:

{¶ 65} "When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party

against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 66} Kelley did not adequately develop the record in either her pretrial pleadings or at trial to sustain her claims relating to the Gladiators. Simply put, Kelley produced no evidence demonstrating that Ferraro misrepresented the value of the Gladiators to Michael Kelley, breached his fiduciary duty by demanding additional cash contributions from the estate, usurped for himself a corporate opportunity in the Cleveland Gladiators, or wrongfully converted Gladiators assets for his own use. In fact, Kelley produced no evidence that the Gladiators had any worth as an asset other than its value as a tax write-off or for "bragging rights."

{¶ 67} As Kelley failed to meet her burden of proof, the trial court did not err in denying her motions for summary judgment and directed verdict and granting appellees' motion for directed verdict on these claims.

## 2. Conversion Claims

{¶ 68} Count 6 of Kelley's second amended complaint averred that Ferraro and K & F had converted for their personal use Michael Kelley's personal and partnership property. Conversion is "any exercise of dominion or control wrongfully exerted over *personal* property of another in denial of or under a claim inconsistent with his rights." (Emphasis added.) *Okocha v. Fehrenbacher* (1995), 101 Ohio App.3d 309, 318, 655 N.E.2d 744.

{¶ 69} With respect to Michael Kelley's personal property, the evidence at trial regarding the ownership and disposition of various ornamental swords, sports memorabilia, figurines, furniture, and other collectibles, as well as $100,000 in cash allegedly in Michael Kelley's office safe and $10,000 on his person at the time of his death, was disputed. Nevertheless, the trial court dismissed this claim on the basis that "this case is not about swords or tables." The trial court erred in dismissing the claim. Because the evidence regarding ownership and disposition of Michael Kelley's personal property was disputed, the jury should have decided the issue.

{¶ 70} With respect to Kelley's claim that Ferraro and K & F converted partnership property, this court has held that conversion claims are generally limited to those based upon the taking of tangible, personal property. *Landskroner v. Landskroner*, 154 Ohio App.3d 471, 2003-Ohio-4945, 797 N.E.2d 1002, ¶ 27. Thus, in *Landskroner*, this court found that the trial court had properly dismissed the appellant's conversion claim because the property was not identifi-

able, personal property but rather was money that the appellant claimed was due and owing him under an agreement. Id. The same reasoning applies here.

{¶ 71} Furthermore, with respect to Kelley's claims regarding other K & F assets such as the jets, defendants refer us to Section 1.7 of the agreement, which provides that "all property owned by the Partnership shall be owned by the Partnership as an entity and no Partner shall have any ownership interest in such property in its individual name or right."[4] Kelley presented no evidence that Michael Kelley had an individual interest in the jets used by K & F. Accordingly, the trial court properly granted appellees' motion for directed verdict regarding Kelley's conversion claim relating to partnership property only.

### 3. Appointment of a Receiver and Imposition of a Constructive Trust

{¶ 72} Kelley next argues that the trial court erred in not appointing a receiver prior to trial to prevent dissipation of K & F's assets and by not imposing a constructive trust at the end of the case upon all K & F monies that were wrongfully withheld, wasted, or converted by appellees (Counts 12 and 13 of the second amended complaint.)

{¶ 73} R.C. 2735.01 permits the appointment of a receiver "[i]n an action * * * between partners or others * * * interested in any property * * * on the application of the plaintiff * * * when it is shown that the property * * * is in danger of being lost, removed or materially injured," or "[i]n all other cases in which receivers have been appointed by the usages of equity." The decision to appoint a receiver is discretionary with the trial court. *Pal, D.V.M. v. Strachan*, 8th Dist. No. 91808, 2009-Ohio-730, 2009 WL 405893, ¶ 14. The party requesting the receivership must show by clear and convincing evidence that the appointment is necessary for the preservation of the complainant's rights. *Malloy v. Malloy Color Lab, Inc.* (1989), 63 Ohio App.3d 434, 437, 579 N.E.2d 248, 250.

{¶ 74} A constructive trust arises when one party has obtained money or property that does not equitably belong to him and that he cannot in good conscience retain or withhold from another who is beneficially entitled to it. *Hunting Valley Builders, Inc. v. Women's Fed. Sav. Bank* (Aug. 23, 1990), 8th Dist. No. 57439, 1990 WL 121272; *Croston v. Croston* (1969), 18 Ohio App.2d 159, 162, 47 O.O.2d 260, 247 N.E.2d 765. "It is raised by equity to satisfy the demands of justice." Id.

---

4. Interestingly, defendants contend that the agreement is unenforceable to support Kelley's contract claims for dissolution and winding up of the partnership, but enforceable against her conversion claims.

{¶ 75} K & F argues that neither a receiver nor a constructive trust was necessary and that Kelley's interest is sufficiently protected by K & F's posting of a supersedeas bond for $4.22 million.

{¶ 76} Although Ferraro's failure to dissolve and wind up K & F, despite the clear and unambiguous language of the agreement requiring him to do so, suggests that the estate's interest in the firm could be at risk, we overrule Kelley's argument regarding appointment of a receiver as premature, because prior to this decision, there was no court order to dissolve and wind up the firm. See, e.g., *Equity Ctrs. Dev. Co. v. S. Coast Ctrs., Inc.* (1992), 83 Ohio App.3d 643, 615 N.E.2d 662 (trial court abused its discretion in appointing receiver before any determination of the parties' rights and interests had been made). It having been determined that K & F is to be dissolved and wound up, the issue of whether a receivership is necessary to protect Kelley's interest is now ripe for the trial court to decide. Likewise, whether the supersedeas bond or a bond of some sort should continue or be issued is for the trial court to decide.

{¶ 77} Appellant's second assignment of error is overruled.

## III. Directed Verdict on Claims Relating to the Agreement

{¶ 78} In her third assignment of error, Kelley argues that the trial court erred in granting appellees' motion for a directed verdict on her claims relating to the agreement. We agree, as set forth above, and accordingly sustain Kelley's third assignment of error.

## IV. Directed Verdict on Kelley's Other Claims

{¶ 79} In her fourth assignment of error, Kelley contends that the trial court committed reversible error by granting a directed verdict for appellees on the other claims in her second amended complaint. We agree, as discussed above, to the extent that the trial court erred in dismissing Kelley's conversion claim regarding Michael Kelley's personal property.

{¶ 80} With respect to Kelley's other remaining claims, we decline to address this assignment of error. The entirety of Kelley's argument is that "at a minimum, there was enough evidence to mandate at least a jury issue as to those claims." It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error. *Boyd v. Lincoln Elec. Co.*, 179 Ohio App.3d 559, 2008-Ohio-6143, 902 N.E.2d 1023, ¶ 62. See also App.R. 12(A)(2) (appellate court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based).

{¶ 81} Accordingly, Kelley's fourth assignment of error is sustained in part and overruled in part.

## V. Trial Judge's Conduct

{¶ 82} In her fifth assignment of error, Kelley contends that the trial court committed reversible error through its biased and unfair conduct during the proceedings. We overrule this assignment of error as moot, because we reverse the jury verdict and remand for a new trial regarding the damages sustained by Kelley as a result of Ferraro's breach of his contractual and fiduciary duties to dissolve and wind up K & F under the terms of the agreement upon Michael Kelley's death and Kelley's conversion claim relating to Michael Kelley's personal property.

## VI. Discovery Issues

{¶ 83} Kelley next contends that she was entitled to full disclosure of K & F's financial dealings, including the particulars of its existing case inventory, under both the discovery rules and the agreement. She contends that the trial court committed reversible error first by failing to require appellees to provide full discovery before trial, and then by not letting counsel argue appellees' discovery abuses to the jury or instructing the jury that they could make adverse inferences based on appellees' failure to provide discovery.

{¶ 84} A trial court has broad discretion on decisions regarding discovery matters. *Dandrew v. Silver*, 8th Dist. No. 86089, 2005-Ohio-6355, 2005 WL 3219730, ¶ 35. Absent an abuse of discretion, an appellate court must affirm a trial court's disposition of discovery issues. *State ex rel. v. Cos. v. Marshall* (1998), 81 Ohio St.3d 467, 469, 692 N.E.2d 198.

{¶ 85} Kelley received over 200,000 pages of financial and other documents in discovery and took 14 discovery depositions. The trial court considered and ruled upon numerous motions to compel and even appointed a special master to oversee discovery in the case. On this record, we do not find that the trial court abused its discretion with respect to appellees' compliance with Kelley's discovery requests. Whether further discovery is necessary because of this court's ruling is first an issue for the trial court on remand. Any argument regarding counsel's argument to the jury during trial or jury instructions regarding an adverse inference is overruled as moot, as we remand for a new trial.

## VII. Testimony of Kelley's Expert

{¶ 86} In her seventh assignment of error, Kelley argues that the trial court committed reversible error in striking the testimony of her expert, Heinz Ickert, as speculative. We overrule this assignment of error because we reverse the trial

court's judgment and remand for a new trial regarding what damages, if any, are due Kelley as a result of Ferraro's breach of his contractual and fiduciary duties to dissolve and wind up K & F. Expert testimony may well be necessary to establish what damages are due Kelley, but whether Ickert's testimony and report are admissible regarding this specific issue is, at this point, unknown. This ruling is reserved to the trial court for appropriate consideration.

## VIII. Costs and Prejudgment Interest

{¶ 87} Finally, Kelley contends that the trial court erred in denying her motion for costs and prejudgment interest. Again we find this assignment of error moot because we reverse the jury verdict and remand for a new trial.

## IX. Appellees' Cross–Appeal

{¶ 88} In their first assignment of error, Ferraro and K & F contend that the trial court erred in denying their motion for summary judgment on their counterclaim for declaratory relief. Appellees sought a declaration that Section 11.1 of the agreement, requiring dissolution of K & F upon any event causing there to be only one partner, was inapplicable to the death of Michael Kelley because there were numerous partners at the time of his death. Further, appellees argued that enforcement of Section 11.4 of the agreement would constitute an illegal fee-sharing arrangement with a nonlawyer. Because we find that the agreement is enforceable for the reasons outlined above, the trial court did not err in denying appellees' motion.

{¶ 89} In their second assignment of error, appellees contend that the trial court erred at trial in converting the estate's claim for breach of the agreement into a quasi-contract/unjust-enrichment claim. Specifically, appellees contend that the trial court should have granted their motion for directed verdict on this claim because there was no evidence of damages to support the claim. In light of our holding that the trial court should have granted summary judgment to the estate on its claims relating to the agreement, we overrule this assignment of error as moot.

{¶ 90} In their third assignment of error, appellees contend that the trial court erred in denying their motion for judgment notwithstanding the verdict. We likewise overrule this assignment of error in light of our holding regarding the enforceability of the agreement.

## X. Conclusion

{¶ 91} The judgment is affirmed in part and reversed in part. The cause is remanded with instructions that K & F be dissolved and wound up, with an accounting and settlement of the estate's interest in accordance with the agree-

ment, and a new trial held regarding the damages, if any, suffered by Kelley as a result of Ferraro's breach of his contractual and fiduciary duties to dissolve and wind up K & F, and on Kelley's conversion-of-personal-property claim.

Judgment affirmed in part
and reversed in part,
and cause remanded.

STEWART and JONES, JJ., concur.