**KELLEY, Appellant,**

v.

**BUCKLEY et al., Appellees.**

[Cite as *Kelley v. Buckley*, 193 Ohio App.3d 11, 2011-Ohio-1362.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 94847.

Decided March 24, 2011.

14

William T. Wuliger, for appellant.

Baker & Hostetler, Randall L. Solomon, Wayne C. Dabb Jr., Lisa M. Ghannoum, and Stephan J. Schlegelmilch, for appellees.

---

COLLEEN CONWAY COONEY, Judge.

{¶ 1} Plaintiff-appellant Lynn Arko Kelley, individually and as executor of the estate of Michael Vincent Kelley (collectively, "the Kelleys"), appeals the trial court's grant of summary judgment in favor of defendants-appellees, Brent M. Buckley and the law firm Buckley King, L.P.A., on all claims asserted in her complaint. Lynn Kelley also appeals the trial court's denial of her motion to delay ruling on Buckley's motion for summary judgment pending Lynn Kelley's receipt of discovery pursuant to Civ.R. 56(F). We find merit to the appeal and reverse.

{¶ 2} This legal-malpractice case arises from the death of Michael Kelley, one of the founding partners of the law firm Kelley & Ferraro, L.L.P. ("K & F"), an Ohio limited law partnership. The facts, as set forth in the affidavits and depositions in the record, are as follows:

{¶ 3} Lynn Kelley is the widow of Michael Kelley, who died on January 2, 2006. In the spring of 1997, Michael Kelley retained Brent Buckley of the Buckley law firm to represent his interests in the formation of K & F. Attorneys at the Buckley firm drafted several versions of the partnership agreement, financing and security agreements, and other legal documents relating to the formation of K & F. Brent Buckley negotiated the terms of the partnership agreement with William Rafferty, the attorney representing the other 50 percent partner of K & F, James Ferraro. Michael Kelley and Ferraro executed the partnership agreement establishing K & F on June 12, 1997.

{¶ 4} At her deposition, Lynn Kelley testified that over the next nine years, Brent Buckley and the Buckley firm represented both herself and her late husband and K & F on a wide variety of legal, business, and personal matters. The Kelleys considered Brent Buckley to be their family's attorney and sought his counsel numerous times over the years. For example, after entering into the partnership agreement with Ferraro, Michael Kelley became concerned that his former employer might commence legal proceedings against him. He was also anxious to convince his former employer to release client files, which were necessary to commence operations at K & F. The Buckley firm opened a file for Michael Kelley and encoded it with the firm's client-identification number beginning with "5020," the four-digit number reserved for all the Kelleys' files.

{¶ 5} The Buckley firm also defended Michael Kelley against contempt charges in the case of *Morgan v. Owens Corning Fiberglass Corp.*, Cuyahoga C.P. No. CV–328407. The Buckley firm also represented Michael Kelley in at least one other case referred to as "the Margaritis matter." The firm performed estate planning for the Kelleys, assisted Lynn Kelley with issues in her judicial campaign, advised Michael Kelley on issues involving his offshore accounts, and assisted Lynn Kelley in the formation of her two businesses, Lindyco and Kellco, Inc.

{¶ 6} The Buckley firm not only represented the Kelleys in their personal and business affairs; Brent Buckley also continued to represent Michael Kelley's interests in K & F. In late 1999, Michael Kelley and Ferraro began renegotiating their existing partnership agreement to explore the possibility of merging K & F with Ferraro & Associates, Ferraro's own separate law firm in Miami, Florida. Michael Kelley and Ferraro discussed this possibility over the next two years. Ferraro was counseled by his own attorney, William Rafferty, and his Florida accountant, Henry Schade. Brent Buckley and business consultant Michael DiCorpo represented Michael Kelley. The parties drafted several proposed agreements, but the merger was never accomplished.

{¶ 7} Notwithstanding the Kelleys' relationship with Brent Buckley and the Buckley firm, Ferraro retained the firm to represent his interests in an anticipat-

ed dispute between him and the Estate of Michael Kelley shortly after Michael Kelley's death. The partnership agreement that Michael Kelley had employed the Buckley firm to draft to protect his interests required that upon dissolution of K & F for any reason (including the death of Michael Kelley), Ferraro was obligated to pay 40 percent of the law firm's gross revenues (less a few minor setoffs) to Lynn Kelley. Buckley asserts in his affidavit that he obtained Lynn Kelley's consent to represent Ferraro against her and the estate of Michael Kelley. However, in her deposition, Lynn Kelley denies that she consented to the representation but testified that Buckley misled her into believing he was still representing her interests and those of her family by advising her to settle with Ferraro. Specifically, Lynn Kelley testified:

> And he told me, in good confidence he told me, "I'm going to help you through this. I want you to settle this, get out as soon as possible. You know that Jimmy is, you know, not to be trusted." And that Jimmy is Mr. Ferraro.

{¶ 8} Lynn Kelley testified that Buckley withheld documents and information from her, including a copy of the K & F partnership agreement, which she repeatedly requested for several weeks. Lynn Kelley further testified that without the benefit of reviewing the K & F partnership agreement to assess her legal status, Buckley advised her to settle quickly. She also claims that he used his knowledge of her financial condition and state of mind to assist those who had interests adverse to hers. Prior to Michael Kelley's death, the Kelleys' son Christopher was injured in a car accident and sustained a traumatic brain injury. Lynn Kelley testified:

> Mr. Buckley knew of the constant care that was entailed around keeping Christopher at home, caring for him as a quadriplegic and in a vegetative state. Christopher was 6 foot 4, hovered around 190 pounds, and I—we, both Mike and I, had to have around-the-clock care for him. He knew how difficult this was, how emotionally damaging it was to our family.
>
> * * *
>
> But he certainly knew that when Michael passed away, that I had to shoulder that then all by myself, and the costs involved and the emotional wear and tear, * * * he knew, he talked to us personally.

{¶ 9} Although Brent Buckley contended at deposition that he did not represent Ferraro until Lynn Kelley sued K & F in April 2006, Theodore Dunn, a partner at the Buckley firm, admitted in a letter to Lynn Kelley's lawyer that the Buckley firm had "been representing James Ferraro and Kelley & Ferraro, LLP ('K & F') in connection with the resolution of the financial interest of the Estate of Michael V. Kelley (the 'Estate') since January 2006." Sheila Thorne, Michael Kelley's former secretary, testified that on the day of Michael Kelley's death,

Ferraro flew to Cleveland from his home in Florida to meet with lawyers at the Buckley firm regarding the Kelleys' financial interest in K & F. Thorne testified:

A: What I understood honestly was he was representing Jim Ferraro that night. That's what I understood.

Q: Which night?

A: The night of Michael's death.

Q: How did you come to that understanding?

A: I actually did not understand it until the next day. Well, because Jimmy called, and he was flying into town and they were going to have a meeting at Buckley's office. They were having it there because if Lynn came to the office, they didn't want her to see anybody there.

{¶ 10} Lynn Kelley testified that Brent Buckley and the Buckley firm also withheld copies of two employment contracts they drafted between K & F and attorney John Sivinski ("Sivinski"), which subsequently became the subject of litigation against Lynn Kelley, i.e., *Sivinski v. Kelley*, Cuyahoga C.P. No. CV–595064. In June 2006, Sivinski sued Lynn Kelley, individually and as executor of Michael Kelley's estate, and K & F alleging that pursuant to an employment agreement executed in July 1997, he was owed a percentage of Michael Kelley's half of K & F's profits. The Buckley firm, as counsel for Ferraro and K & F, filed a cross-claim for indemnification against Lynn Kelley as executor of Michael Kelley's Estate.

{¶ 11} However, another agreement executed in 1999 superseded the first contract and greatly reduced the terms of Sivinski's compensation at K & F. Sivinski denied the existence of the 1999 contract, and the Buckley firm failed to produce a copy of the 1999 agreement, which would have proved that Sivinski's claim was fraudulent. When Lynn Kelley later obtained a copy of the 1999 Sivinski contract from Ferraro, she was able to prove that Sivinski's case was fraudulent. Lynn Kelley ultimately won a directed verdict on Sivinski's claims, as well as $200,000 in compensatory damages, $400,000 in punitive damages, and $296,000 in attorney fees on her counterclaims for spoliation of evidence and abuse of process against Sivinski.[1]

{¶ 12} Although the Buckley firm denied drafting these agreements, the firm's partner, Theodore Dunn, admitted that the first Sivinski agreement was generated on the Buckley firm's computers, as evidenced by the tracking codes on the document. The Buckley firm claims that Michael DiCorpo, a nonlawyer with access to the Buckley firm's computers, drafted the 1999 agreement on the firm's computers without its knowledge. DiCorpo denies any involvement in the

---

1. This court reviewed *Sivinski* in appeal No. 94296, argued in January 2011.

creation of that contract and testified that Brent Buckley must have drafted the second contract. Although Dunn and DiCorpo testified that the second contract was also generated on the Buckley firm's computers, it is undisputed that the Buckley firm never produced the second document when requested during discovery.

{¶ 13} In November 2006, Lynn Kelley filed the instant malpractice complaint against Brent Buckley and the Buckley firm, alleging five counts of legal malpractice, spoliation of evidence, breach of fiduciary duty, tortious interference with the estate of Michael Kelley's relationship with K & F, civil conspiracy, and abuse of process. In February 2007, Brent Buckley and the firm withdrew as counsel for Ferraro and K & F in the cases of *Kelley v. Ferraro* and *Sivinski*. In his affidavit, Brent Buckley stated that the firm withdrew as counsel "for reasons unrelated to this case." In February 2010, the trial court granted Brent Buckley and the Buckley firm's motion for summary judgment without opinion or explanation. Lynn Kelley now appeals, raising two assignments of error.

{¶ 14} In the first assignment of error, Lynn Kelley argues that the trial court erred in granting summary judgment in favor of Buckley and the Buckley firm on all of her claims. An appellate court reviews a trial court's decision on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, citing *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus.

*Legal Malpractice*

{¶ 15} Lynn Kelley argues that the trial court erred in granting summary judgment in favor of Buckley on her legal-malpractice claims. To establish a cause of action for legal malpractice, the plaintiff must show (1) that the attorney owed a duty or obligation to plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is causal connection between the conduct complained of and the resulting damage or loss. *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 674 N.E.2d 1164, syllabus.

{¶ 16} Buckley contends that summary judgment in their favor was proper because (1) Michael Kelley limited the scope of the attorney-client relationship regarding the formation of K & F, and the firm did not breach any duty owed to

him to ensure that K & F was a valid Ohio partnership or that the partnership agreement was enforceable, (2) the firm did not breach a duty to Michael Kelley regarding the Sivinski agreements because Michael Kelley did not retain Buckley to draft those agreements, 3) Kelley failed to raise a genuine issue as to whether Buckley breached any of Michael Kelley's confidences, (4) Lynn Kelley waived any conflict of interest by not seeking to disqualify the Buckley firm as counsel for Ferraro and K & F, (5) Lynn Kelley failed to prove she was damaged by any alleged malpractice, (6) Lynn Kelley's claims are barred by the applicable statute of limitations, and (7) Lynn Kelley failed to present admissible expert evidence in support of her malpractice claims. We find no merit to any of these assertions.

### Legal Duty

{¶ 17} Buckley argues that the firm did not breach any duty of care owed to Michael Kelley when it negotiated the K & F partnership agreement on Michael Kelley's behalf in 1997 because Michael Kelley had limited the scope of its representation on that undertaking. At deposition, Brent Buckley testified:

> At that time as well as a few times after that first phone call he said that we were "fucking up the transaction" to, "don't fuck up" the transaction. "We're fucking everything up." That he needed to "get this deal done." He "didn't care how it got done." He "didn't care what it took" and finally it was either that, I think it was that phone call but may have been the following phone call where he said, "stay out of it. I'm negotiating this thing. I don't need you coming up with all kinds of crazy documents and crazy structures. You just do what I tell you to do in terms of forming the entity."

{¶ 18} Buckley claims these instructions ended the attorney-client relationship between him and Michael Kelley and extinguished any duty of care. However, Buckley admitted that these instructions were never "memorialized." Brent Buckley also admits that he and his firm were responsible for ensuring the legality of K & F as an Ohio law partnership, even after the scope of their engagement was allegedly curtailed.

{¶ 19} Moreover, Buckley's entire defense is dependent upon the hearsay statements of the late Michael Kelley. Evid.R. 804(B)(5), which governs hearsay exceptions, provides that a decedent's declarations are admissible only to rebut testimony of an adverse party. *Eberly v. A–P Controls, Inc.* (1991), 61 Ohio St.3d 27, 572 N.E.2d 633, paragraph one of the syllabus. Evid.R. 804(B)(5) is an exception to the hearsay rule that exists only for the benefit of the executor or other representative of a decedent's estate and is not available to a party opposing the decedent. *Johnson v. Porter* (1984), 14 Ohio St.3d 58, 62–63, 14 OBR 451, 471 N.E.2d 484. The exception was formulated to safeguard an estate from fraudulent claims and to create an "evidentiary balance" between the

testimony permitted through Evid.R. 601 and the contradictory, but hearsay, statements of a decedent on the same matter. Id. Thus, Buckley may not rely on Michael Kelley's hearsay statements to argue that Michael Kelley terminated the attorney-client relationship and extinguished their duty to him.

{¶ 20} Buckley also argues that this court's decision in *Kelley v. Ferraro,* 188 Ohio App.3d 734, 2010-Ohio-2771, 936 N.E.2d 986, precludes a finding of legal malpractice because the partnership agreement forming K & F has been declared legally valid. However, Lynn Kelley's malpractice claims extend well beyond the alleged failure to ensure the validity of the partnership agreement. A portion of Lynn Kelley's malpractice claims relate to Buckley's involvement in *Sivinski.* As previously explained, Sivinski sued Lynn Kelley, individually and as the executor of the estate of Michael Kelley, claiming that they and K & F owed him a portion of Michael Kelley's share of the firm's profits. Sivinski's claim was based on an employment contract executed in 1997. Lynn Kelley's malpractice claim alleges that at the time Sivinski's suit was filed, Buckley was aware that this 1997 contract was superseded by a later contract, which, if produced, would have exposed Sivinski's suit as fraudulent.

{¶ 21} Buckley contends that they had no involvement in either of the Sivinski contracts. However, the record contains conflicting evidence on this issue. As previously mentioned, Dunn admitted that the first Sivinski agreement was generated on the Buckley firm's computers as evidenced by tracking codes on the document. Although the Buckley firm claims that DiCorpo drafted the subsequent agreement on the Buckley firm's computers without its knowledge, DiCorpo denied any involvement in the creation of either Sivinski contract. DiCorpo testified that Brent Buckley must have been the drafter of the second contract. Yet Buckley defended Ferraro and K & F in the *Sivinski* case and asserted a cross-claim against Lynn Kelley for indemnification.

{¶ 22} Thus, there is a genuine issue of material fact as to whether Brent Buckley and the Buckley firm created the Sivinski contracts that became the subject of litigation against Lynn Kelley and whether they could have swiftly ended that litigation by producing the second Sivinski contract. Yet it is undisputed that the Buckley firm never produced the second contract, which suggests the possibility, as Lynn Kelley alleges, that they concealed the existence of the second Sivinski agreement to put pressure on Lynn Kelley so she would compromise and abandon her claims against Ferraro and K & F. Based on the conflicting evidence in the record, we find that the trial court erred in finding no genuine issues of fact on these very serious allegations.

*Waiver of Conflict of Interest*

{¶ 23} Brent Buckley contends that Lynn Kelley consented to the Buckley firm's representation of Ferraro and K & F in her claims against them.

However, the record contains no written consent to that effect, and Lynn Kelley testified that she never gave her consent. Buckley also argues that Lynn Kelley waived any claims based upon conflict of interest by not seeking to disqualify Buckley and the Buckley firm as counsel for Ferraro and K & F in both *Kelley v. Ferraro* and *Sivinski*. Consequently, Buckley contends that Lynn Kelley impliedly consented to Buckley's adverse representation.

{¶ 24} Rule 1.9 of the Rules of Professional Conduct, which governs an attorney's duties to former clients, provides:

(a) Unless the former client gives *informed consent, confirmed in writing,* a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a *substantially related matter* in which that person's interests are materially adverse to the interests of the former client.

(Emphasis added.)

{¶ 25} Similarly, DR 5–105 of the Code of Professional Responsibility, which preceded the Rules of Professional Conduct and was in effect until February 2007, provided:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment * * *

* * *

(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment.

[6] {¶ 26} The primary purpose behind the prohibition in DR 5–105 against dual representation of clients with adverse interests is to ensure that confidences or secrets of a client imparted to an attorney in the course of their attorney-client relationship will not be revealed to an adverse party or used to the client's disadvantage. *Sarbey v. Natl. City Bank, Akron* (1990), 66 Ohio App.3d 18, 26, 583 N.E.2d 392. Under the Code of Professional Responsibility, these violations of the confidentiality of the attorney-client relationship were proscribed by DR 4–101(B):

Except when permitted under DR 4–101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

{¶ 27} In support of its argument, Buckley cites *Sarbey* for the proposition that a former client may be held to have waived the right to object to an attorney's subsequent representation of an adverse interest by failing to timely raise an objection. However, *Sarbey* explained that this "general rule" is actually limited to "extreme circumstances." Id. at 29. *Sarbey* explained that in determining whether an attorney should be disqualified from representing an interest adverse to a former client, the courts have generally recognized that a "substantial relationship test" is to be applied. Id. at 23. "That test requires that disqualification should be ordered where there is any substantial relationship between the subject matter of a former representation and that of a subsequent adverse representation." Id., citing *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.* (S.D.N.Y.1953), 113 F.Supp. 265, 268.

{¶ 28} *Sarbey* further explained that to establish a "substantial relationship":

"[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained."

Id., quoting *T.C. Theatre Corp.* at 268.

{¶ 29} In *Cinema 5, Ltd. v. Cinerama, Inc.* (C.A.2, 1976), 528 F.2d 1384, 1387, which is quoted extensively in *Sarbey*, the court held that a lawyer's duty to his client is that of a fiduciary or trustee, who owes his client "undivided loyalty." *Cinema 5* rejected the "substantial relationship" test generally applied in determining whether a lawyer may accept employment against a former client, and held that "[w]here the relationship is a continuing one, adverse representation is prima facie improper." Id. at 1386–1387. See also *Sarbey* at 24. The *Cinema 5* court stated: "Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." Id. at 1386. The court declined to decide "[w]hether such adverse representation, without more, requires disqualification in every case," but held that "the attorney must be prepared to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." Id. at 1387.

{¶ 30} It is not clear when the attorney-client relationship between Buckley and the Kelleys ended. Lynn Kelley testified that after her husband died in January 2006, Brent Buckley advised her to settle quickly with Ferraro because

he (Ferraro) could not be trusted. In determining whether an adverse relationship is simultaneous or continuing, the status of the attorney-client relationship is assessed at the time the conflict arises, not at the time the motion to disqualify is presented to the court. Otherwise, the accused attorney or law firm could easily transform the relationship from "continuing" to "former," by abandoning one of his clients, thereby securing application of the more lenient "substantial relationship" test. *Picker Internatl., Inc. v. Varian Assoc., Inc.* (N.D.Ohio 1987), 670 F.Supp. 1363, 1365–1366, affirmed (Fed.Cir.1989), 869 F.2d 578. Yet Dunn admitted in a letter to Lynn Kelley's lawyer that the Buckley firm had been representing Ferraro and K & F since January 2006, the month Michael Kelley died. Sheila Thorne, Michael Kelley's secretary at K & F, testified that Ferraro flew to Cleveland the day Michael Kelley died, and Ferraro met with Brent Buckley to discuss Lynn Kelley's financial interest in K & F. Thus, there are genuine issues of material fact as to whether Buckley represented Ferraro simultaneously with Lynn Kelley and thus whether the relationship was prima facie improper.

{¶ 31} Nevertheless, the record clearly indicates that Brent Buckley was engaged in a conflict of interest by representing an interest adverse to Lynn Kelley and the estate of Michael Kelley. In *Sarbey*, the court noted that "[t]he concept of implied consent or waiver is closely akin to the equitable concepts of estoppel and laches." Id., 66 Ohio App.3d at 29, 583 N.E.2d 392, citing *Cleveland v. Cleveland Elec. Illum. Co.* (N.D.Ohio 1976), 440 F.Supp. 193, 202–203. "Accordingly, the equitable remedy of imposing an implied waiver will not be used to bar a motion to disqualify where no prejudice has resulted from the delay." Id. Furthermore, "any prejudice resulting from such delay must be further balanced against the serious ethical implications of dual representation * * *." Id. *Sarbey* explained:

> Where dual representation is involved, the court should apply the implied consent or waiver remedy with caution. A motion to disqualify counsel for conflict of interest stemming from dual representation of adverse clients should be denied on the basis of implied consent or waiver only where there is substantial proof that the movant's delay has resulted in serious prejudice to the opposing party, or where litigation has proceeded to the point where disqualification would create substantial hardship to the opposing party * * *.

Id., 66 Ohio App.3d at 29, 583 N.E.2d 392.

{¶ 32} No one has suggested that any prejudice resulted from Lynn Kelley's delay in objecting to Buckley's representation of Ferraro or K & F. Moreover, the client, Ferraro and/or K & F is the party who would have standing to assert prejudice, not the lawyer. Therefore, we find Buckley's claim of implied waiver or consent to be without merit.

*Breach of Confidences*

{¶ 33} Buckley argues that Lynn Kelley's legal-malpractice claims could not survive summary judgment because her claim for breach of Michael Kelley's confidences lapsed with his death. In other words, Buckley claims that Michael Kelley's death freed them to reveal any confidences shared during the attorney-client relationship between Michael Kelley and the Buckley firm to parties with adverse interests or anyone else. Buckley asserts that disclosure of a person's confidences amounts to a claim of "invasion of privacy" and that a claim for invasion of privacy is personal to the individual whose privacy is allegedly invaded and lapses with the death of that person. We disagree.

{¶ 34} In support of their argument, Buckley relies on *Kutnick v. Fischer*, Cuyahoga App. No. 81851, 2004-Ohio-5378, 2004 WL 2251799, in which Kutnick sued her attorneys for legal malpractice because they disclosed confidential communication to the probate court during her guardianship proceeding. While her claim was pending, Kutnick died, and the administrator of her estate pursued the legal-malpractice claim. This court concluded that the disclosure of her confidences to the probate court in the guardianship proceeding, without more, did not constitute legal malpractice. The court noted that under the limited facts of the case, Kutnick would have had a claim for invasion of privacy except that claims for invasion of privacy are personal to the individual whose privacy is allegedly invaded and lapse with his or her death. Id. at ¶ 27.

{¶ 35} However, the holding in *Kutnick* is limited to the facts of that particular case and does not preclude a legal-malpractice claim involving breach of confidences under different circumstances. *Kutnick* explained that although an attorney's breach of professional obligations under the disciplinary rules does not necessarily translate into tort duties the attorney owes his client, "[t]he existence of a duty in tort depends upon the relationship of the parties and the foreseeability of injury to someone in [the] plaintiff's position." Id. at ¶ 17 and 21, citing *Simmers v. Bentley Constr. Co.* (1992), 64 Ohio St.3d 642, 645, 597 N.E.2d 504.

{¶ 36} It is well settled that the lawyer's duty to preserve the client's confidences survives the termination of the attorney-client relationship. *Kala v. Aluminum Smelting & Refining Co., Inc.* (1998), 81 Ohio St.3d 1, 4, 688 N.E.2d 258. Furthermore, the attorney-client privilege does not expire upon the client's death. *Kler v. Mazzeo* (Mar. 21, 1991), Cuyahoga App. Nos. 58310 and 58311, 1991 WL 39682, citing *Swetland v. Miles* (1920), 101 Ohio St. 501, 130 N.E. 22. Obviously, the disclosure of client confidences could constitute a claim for legal malpractice if the other necessary elements of a legal-malpractice claim are established. Therefore, we find no merit to Buckley's claim that Lynn Kelley's legal-malpractice claims fail because the attorney-client privilege lapsed with Michael Kelley's death.

*Damages*

{¶ 37} Buckley argues that Lynn Kelley's legal-malpractice claims fail because she failed to demonstrate a genuine issue as to whether the alleged malpractice proximately caused any damages. Buckley asserts that Lynn Kelley was already awarded $600,000 in damages and $296,000 in attorney fees on her counterclaims in *Sivinski,* and this court reversed the trial court's ruling in favor of Ferraro on the validity of the partnership agreement and "remanded with instructions that K & F be dissolved and wound up, with an accounting and settlement of the estate's interests in accordance with the agreement, and a new trial held regarding the damages." *Kelley v. Ferraro,* 188 Ohio App.3d 734, 2010-Ohio-2771, 936 N.E.2d 986, at ¶ 91.

{¶ 38} Lynn Kelley's legal expert, Amelia A. Bower, opined that Lynn Kelley suffered damage as a result of Buckley's actions. In her report, Bower states: "At a minimum, damage to the estate is the cost and expense of discovering information, files and documents that should have been made immediately available to the Estate upon the death of Michael V. Kelley." Although Lynn Kelley recovered damages on her counterclaims against Sivinski, Lynn Kelley can still pursue a judgment for damages against Buckley if Buckley contributed to Lynn Kelley's damages.

{¶ 39} Further, Lynn Kelley testified that Buckley's failure to produce the K & F partnership agreement and his advice to settle quickly with Ferraro caused her emotional distress. Lynn Kelley testified as follows:

So what I'm saying is that he knew what harm, hurt, all of the work involved in this, the financial work involved in this, and yet he wasn't assisting us, as our lawyer should have, as he was, and I thought he would, in getting the wherewithal to keep my son at home and to feel comfortable about knowing that we could pay for this type of care.

* * *

Not knowing how I'm going to pay for my son's care. What do you mean, how does that affect me emotionally? Of course, it affected me emotionally. * * * Sleepless nights, worry about where I'm going to get the money, worry about, am I going to have to put my son into a nursing home, of course, all of that. And he knew that Michael paid for this, that I would have to continue paying for this. He didn't assist me in that.

{¶ 40} Thus, there is evidence in the record showing uncompensated damages for which a jury should determine the value.

## Statute of Limitations

{¶ 41} Buckley argues that Lynn Kelley's legal-malpractice claims are barred by the statute of limitations. The statute of limitations for an action for legal malpractice is one year. R.C. 2305.11(A). A legal-malpractice action accrues and the statute of limitations begins to run when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or nonact, and the client is put on notice of the need to pursue his possible remedies against the attorney, or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later. *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 538 N.E.2d 398, at syllabus.

{¶ 42} A "cognizable event" is an event sufficient to alert a reasonable person that in the course of legal representation, his attorney committed an improper act. *Wozniak v. Tonidandel* (1997), 121 Ohio App.3d 221, 699 N.E.2d 555. In determining the cognizable event, the "focus should be on what the client was aware of and not an extrinsic judicial determination." *Vagianos v. Halpern* (Dec. 14, 2000), Cuyahoga App. No. 76408, 2000 WL 1844752, citing *McDade v. Spencer* (1991), 75 Ohio App.3d 639, 600 N.E.2d 371.

{¶ 43} Oftentimes, the question of when an attorney-client relationship for a particular undertaking or transaction has terminated is a fact question. *Omni–Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 388, 528 N.E.2d 941. Buckley contends that Buckley's representation of Michael Kelley regarding the formation of the K & F partnership agreement terminated, at the latest, on June 12, 1997, when Michael Kelley and Ferraro signed the partnership agreement, and the Buckley firm filed the certificate of limited liability partnership for K & F. Buckley denies drafting the Sivinski agreements but asserts that because Sivinski signed the 1997 employment agreement in July 1997, the statute of limitations as to that representation would have terminated no later than July 1998. However, Buckley's own legal expert, Geoffrey Stern, opined: "The representation of Mr. Buckley and the Buckley firm of Mr. Kelley ceased upon Mr. Kelley's death on January 2, 2006." Thus, the evidence produced by Buckley alone creates an issue of fact as to when the attorney-client relationship ended, not to mention Lynn Kelley's testimony that Brent Buckley advised her to settle her case against Ferraro and K & F after Michael Kelley's death.

{¶ 44} As previously explained, Ohio law provides that the statute of limitations in malpractice cases commences upon *the later* of the termination of the relationship or the discovery of the underlying malpractice. *Omni–Food & Fashion, Inc.*, 38 Ohio St.3d 385, 528 N.E.2d 941, at paragraph one of the syllabus. Lynn Kelley testified that Buckley refused to produce a copy of the K

& F partnership agreement when she needed it to assess her status and the rights of Michael Kelley's estate under the agreement until several weeks after Michael Kelley's death in early 2006. She also testified that Buckley failed to produce copies of the Sivinski employment agreements that would have exposed Sivinski's claims against the estate as fraudulent after Sivinski filed his complaint in 2006. Both of these actions constitute cognizable events sufficient to alert a reasonable person that in the course of legal representation, his attorney committed an improper act, and these cognizable acts were not committed until 2006. It is undisputed that Lynn Kelley filed the complaint commencing this legal-malpractice action in November 2006, in the same year these alleged improper acts were committed. Therefore, if the trial court granted summary judgment in favor of Buckley on statute-of-limitations grounds, it did so in error.

### Expert Evidence

{¶ 45} Buckley argues that Lynn Kelley's legal-malpractice claims fail because her expert failed to state the facts supporting her opinions. In support of this assertion, Buckley cites *Jarrett v. Forbes, Fields & Assoc. Co., L.P.A.,* Cuyahoga App. No. 88867, 2007-Ohio-5072, 2007 WL 2793349, in which this court affirmed the trial court's exclusion of the plaintiff's expert's affidavit because, among other things, he had "failed to state the basis for his conclusion." Id. at ¶ 17–18. The expert opinion at issue in that case stated:

Based upon my review of those documents, my knowledge of the law and of the field of practice involved in plaintiff's personal injury claims, it is my opinion to a reasonable degree of probability that the further prosecution of the claims of Errol Jarrett in the matter of Jarrett v. Edmund [sic] Elevator Co., Inc., would have resulted in the payment of Errol Jarrett of monies by the Defendant, Edmond [sic] Elevator, and/or its insurer.

{¶ 46} *Jarrett* concluded that the expert failed to display any knowledge of the facts pertaining to the underlying case and was properly excluded. Id.

{¶ 47} Here, Bower's preliminary report includes statements of relevant facts in her conclusions. Indeed, many of Bower's conclusions are findings of fact. For example, in her preliminary report she states:

1. Brent Buckley, while an attorney at Buckley King, represented Michael V. Kelley, personally.

2. Brent Buckley, while an attorney at Buckley King, was engaged by Michael V. Kelley to draft partnership documents for the formation of Kelley & Ferraro, LLP. Mr. Ferraro was represented by separate counsel at the time. Neither Mr. Buckley or the Buckley King firm ever represented James L. Ferraro.

\* \* \*

7. As a result of accepting the engagement to represent James L. Ferraro and Kelley & Ferraro, LLP, Brent Buckley and the Buckley King firm foreclosed the Estate of Michael V. Kelley from obtaining documents, files and information that would otherwise have been readily available to the estate.

{¶ 48} Thus, Bower's preliminary opinion included relevant facts upon which to base her expert opinion. Moreover, Bower later submitted another expert report that included an expanded version of the facts. Therefore, we find that Bower's expert report included sufficient facts to support her opinions.

{¶ 49} Having determined that there are genuine issues of material fact relating to all elements of Lynn Kelley's legal-malpractice claims, we find that summary judgment on those claims was erroneous.

*Spoliation of Evidence*

{¶ 50} Buckley argues that summary judgment was proper on Lynn Kelley's spoliation claim because she "only made a passing reference to spoliation" in her complaint. To support this argument, Buckley relies on *Williams v. W. Res. Transit Auth.*, Mahoning App. No. 06–MA–137, 2007-Ohio-4747, 2007 WL 2694684, in which the court affirmed the trial court's granting the defendant's motion to dismiss for failure to state a claim for a civil-rights violation under Section 1983, Title 42, U.S.Code. The complaint did not mention Section 1983, nor did it allege that the plaintiff's civil rights were violated by a person acting under color of state law. Although the complaint made a "passing reference" to the "First Amendment," the court held "that reference identifies the *source* of the public policy that underlies Williams' wrongful discharge in violation of public policy claim," but did not place the transit authority on notice of a claim showing entitlement to relief. (Emphasis sic.) Id. at ¶ 22. *Williams* explained that Ohio courts have consistently held that " 'a complaint alleging an action under 42 U.S.C. 1983 must meet two requirements: (1) there must be an allegation that the conduct in question was performed by a person acting under color of state law; and (2) the complaint must sufficiently allege that the conduct deprived the plaintiff of a federal right.' " Id. at ¶ 20, quoting *Snell v. Seidler*, Monroe App. No. 04 MO 15, 2005-Ohio-6785, 2005 WL 3489774, ¶ 26–27, citing *Cooperman v. Univ. Surgical Assoc., Inc.* (1987), 32 Ohio St.3d 191, 199, 513 N.E.2d 288. Thus, Ohio law provides specific pleading requirements for Section 1983 claims that do not apply to the facts of this case.

{¶ 51} Because Ohio is a notice-pleading state, Ohio law does not ordinarily require a plaintiff to plead operative facts with particularity. *Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 2002-Ohio-2480, 768 N.E.2d 1136, ¶ 29; Civ.R. 8(A). Pursuant to Civ.R. 8(A), a pleading that sets forth a claim for relief shall contain (1) a short and plain statement of the claim showing that the party is

entitled to relief and (2) a demand for judgment for the relief to which the party claims to be entitled. Id. Civ.R. 8 does not require that each claim for relief be stated under a separate count.

{¶ 52} Lynn Kelley's complaint alleges:

In the course of defendants' legal representation of James L. Ferraro and the firm of Kelley & Ferraro, L.L.P. in that litigation, they have * * * participated in the spoliation or wrongful disclosure and/or nondisclosure of evidence, all contrary to the interests of the plaintiff.

{¶ 53} Each of the counts enumerated in the complaint incorporates these allegations "as if fully rewritten" and further allege:

As a direct and proximate result of the professional negligence, malpractice *and other misconduct* of the defendants, plaintiff has sustained and will continue to sustain significant economic damages and other compensable loss.

(Emphasis added.)

{¶ 54} We find that these allegations contain a plain statement of specific facts showing that Lynn Kelley is entitled to relief.

*Tortious Interference*

{¶ 55} Buckley argues that summary judgment should be affirmed on Lynn Kelley's claims for tortious interference with her commercial and contractual relationships with K & F and Ferraro because she did not produce any evidence that Buckley's legal fees were paid out of the 40 percent profits that K & F owed to Michael Kelley's Estate. Buckley also contends that their receipt of the fees was privileged because the fees were received while they were acting as counsel for K & F and Ferraro.

{¶ 56} To prevail on a claim for tortious interference with a business relationship, the plaintiff must prove "(1) a business relationship; (2) the wrong-doer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Wolf v. McCullough–Hyde Mem. Hosp., Inc.* (1990), 67 Ohio App.3d 349, 355, 586 N.E.2d 1204. The basic principle for an action based upon tortious interference is that "one, who is without privilege [and] induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby." Id. The following factors should be considered when determining whether a privilege exists: "(a) the nature of the actor's conduct; (b) the nature of the expectancy with which his conduct interferes; (c) the relation between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interest in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." Id.

{¶ 57} Here, Michael Kelley had a business relationship with Ferraro as a partner of K & F. A decedent's legal representative stands in the shoes of the decedent with respect to his financial and commercial rights and obligations, and a partner's legal interest in the partnership continues through his estate after his death. *Kelley v. Ferraro*, 188 Ohio App.3d 734, 2010-Ohio-2771, 936 N.E.2d 986, at ¶ 55. When Michael Kelley died, Lynn Kelley, as executor of his estate, took over the business relationship in his stead. Further, Paragraph 12.2 of the K & F partnership agreement provides that all its terms inure to the benefit of the signatories' heirs, legatees, legal representatives, successor, transferees, and assigns. Thus, because Michael Kelley's estate has a legal interest in Michael Kelley's partnership interest, K & F had a business relationship with Lynn Kelley as executor of the estate.

{¶ 58} Since Brent Buckley and several other lawyers of the Buckley firm were involved in drafting the partnership agreement, they knew that the estate of Michael Kelley was entitled to 40 percent of the K & F firm's gross revenues under that agreement. By representing Ferraro and K & F against Lynn Kelley and the estate, Buckley was involved in K & F's breach of the partnership agreement by opposing Lynn Kelley's rights under the partnership agreement. As a result, Lynn Kelley testified that she suffered emotional distress, and her legal expert opined that the estate suffered "the cost and expense of discovering information, files and documents that should have been made immediately available to the Estate upon the death of Michael V. Kelley." Thus, the record contains ample evidence to withstand a motion for summary judgment on Lynn Kelley's claim for tortious interference with a business relationship.

{¶ 59} Despite knowing that Lynn Kelley was entitled to K & F revenues, Buckley admitted that Lynn Kelley was not paid because the K & F firm had other priorities for its cash above Lynn Kelley's entitlement. Although Buckley asserts that his fees were not paid out of Lynn Kelley's share of the K & F revenues, it is undisputed that Buckley accepted fees from K & F. During this same time, Lynn Kelley received nothing, even though the partnership agreement that Buckley had drafted for Michael Kelley provided that Michael Kelley's estate was to receive 40 percent of all gross revenues within 30 days of receipt. See *Kelley v. Ferraro*, 188 Ohio App.3d 734, 2010-Ohio-2771, 936 N.E.2d 986, at ¶ 42.

{¶ 60} Buckley argues that Lynn Kelley cannot establish that the fees were taken from the estate's 40 percent share. Yet while Ferraro was using K & F assets to pay Buckley's fees, he was also claiming that he was not legally obligated to pay Lynn Kelley's 40 percent share of K & F revenues. Id. Thus, there is a genuine issue as to whether Buckley could have believed that their fees

were coming strictly out of Ferraro's share of firm revenues and that Lynn Kelley's 40 percent share was earmarked, segregated, and protected.

{¶ 61} Finally, Buckley claims that his actions were privileged because the alleged misconduct occurred while he was acting as counsel for K & F and Ferraro. "[A] defendant's interference with a contract is not actionable when the defendant is vested with a privilege." *Andrews v. Carmody* (2001), 145 Ohio App.3d 27, 33–34, 761 N.E.2d 1076. However, claims of privilege may be overcome by a clear and convincing showing of malice, which requires evidence of a conscious disregard of his obligations as the Kelleys' attorney and/or former attorney or of the rights of Lynn Kelley and the estate of Michael Kelley. *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 11–12, 651 N.E.2d 1283. There is evidence in the record suggesting that Brent Buckley acted with malice when he undertook to represent Ferraro and K & F, which had interests adverse to his clients.

{¶ 62} Moreover, Buckley's claim of privilege in the context of this case is contrary to public policy and a perversion of the purpose of qualified privilege. Buckley's misconduct (in representing Ferraro's interests against his clients) would create the privilege and provide immunity from liability for the harm he allegedly caused Lynn Kelley as a result of that misconduct. Therefore, summary judgment should not have been granted on Lynn Kelley's tortious-interference claim.

### Abuse of Process

{¶ 63} Buckley argues that summary judgment on Lynn Kelley's abuse-of-process claim should be affirmed because he filed a cross-claim against her and the estate on behalf of K & F for a legitimate purpose in *Sivinski*, and because Lynn Kelley failed to raise a genuine issue as to whether Buckley's conduct was privileged and/or Michael Kelley's estate was damaged. Buckley asserts that the cross-claim for indemnification in *Sivinski* was not the product of improper motivation, but simply an attorney representing the interests of his client.

{¶ 64} "The three elements of the tort of abuse of process are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.* (1994), 68 Ohio St.3d 294, 626 N.E.2d 115, paragraph one of the syllabus.

{¶ 65} Buckley argues that by asserting that they filed the cross-claim in *Sivinski* "when they knew that the Kelley estate could not be held personally liable," refutes the first element of the abuse-of-process claim that requires that

the legal proceeding begin "in proper form" and "with probable cause." Buckley suggests that Lynn Kelley's own allegations raise a claim of malicious prosecution rather than abuse of process. However, neither Buckley nor K & F set the *Sivinski* case in motion because Sivinski commenced that litigation against Lynn Kelley and K & F. Lynn Kelley's claim is that Buckley used the proceeding, which was commenced by a third party who is not a party in the instant case, for the ulterior purpose of forcing her to compromise and abandon her claims against Ferraro under the K & F partnership agreement.

{¶ 66} Buckley further argues that even if the elements for abuse of process were met, "an attorney * * * may only be held liable if he acts maliciously and has an ulterior purpose which is completely separate from his client's interest." *Wolfe v. Little* (Apr. 27, 2001), Montgomery App. No. 18718, 2001 WL 427408. However, Lynn Kelley asserts that Buckley had an independent motive for misusing the *Sivinski* litigation. Lynn Kelley alleges that the Buckley firm defended asbestos cases prosecuted by K & F and settled those cases with K & F in exchange for kickbacks. Lynn Kelley asserts that Buckley knew that under the terms of the partnership agreement, K & F had to be dissolved and wound up and that if K & F were dissolved, Buckley might lose the benefit of this "kickback scheme."

{¶ 67} There is evidence creating a genuine issue as to whether Buckley benefitted from a "kickback scheme" from K & F. Lynn Kelley testified at her deposition that her husband, Michael Kelley, gave Brent Buckley money in exchange for settling asbestos claims with K & F. Therefore, Lynn Kelley claims, Buckley used the *Kelley v. Ferraro* and *Sivinski* cases to pressure her into an unfavorable settlement that might preserve K & F.

{¶ 68} Buckley again argues that Lynn Kelley's abuse-of-process claim must fail because there is no evidence that she or the estate suffered any damage. However, as previously discussed, Lynn Kelley's expert opined that damage to the estate includes the cost and expense of discovering information and files. Lynn Kelley also testified that she suffered emotional distress as a result of the other two cases. Therefore, there is a genuine issue regarding the amount of damage the estate suffered from the alleged abuse of process. Consequently, the court erred in granting summary judgment on Lynn Kelley's abuse-of-process claim.

### Aiding and Abetting and Civil Conspiracy

{¶ 69} Buckley argues that summary judgment was properly granted as to Lynn Kelley's aiding-and-abetting and civil-conspiracy claims because (1) Lynn Kelley abandoned those claims, (2) Ohio does not recognize a claim for aiding and abetting, (3) Buckley's conduct was privileged, (4) Buckley could not conspire

with their clients, and (5) Lynn Kelley failed to raise a genuine issue as to key elements of these claims.

{¶ 70} Lynn Kelley argues these claims in her appellate brief and has therefore not abandoned them on appeal. Further, aiding and abetting and civil conspiracy are cognizable claims in Ohio. *O'Brien v. Olmsted Falls*, Cuyahoga App. Nos. 89966 and 90336, 2008-Ohio-2658, 2008 WL 2252527. In a civil aiding-and-abetting case, a plaintiff must show two elements: (1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act. *Andonian v. A.C. & S., Inc.* (1994), 97 Ohio App.3d 572, 647 N.E.2d 190. To establish a civil-conspiracy claim, the plaintiff must prove: (1) a malicious combination of two or more persons, (2) causing injury to another person or property, and (3) the existence of an unlawful act independent from the conspiracy itself. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 700 N.E.2d 859. An action for civil conspiracy cannot be maintained unless an underlying unlawful act, which would be actionable in the absence of the conspiracy, is committed. *Gosden v. Louis* (1996), 116 Ohio App.3d 195, 219–220, 687 N.E.2d 481. The malice involved in the tort is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Pickle v. Swinehart* (1960), 170 Ohio St. 441, 443, 11 O.O.2d 199, 166 N.E.2d 227; *Gosden* at 219.

{¶ 71} Lynn Kelley's aiding-and-abetting and conspiracy claims allege that Buckley assisted Ferraro, K & F, and Sivinski in the *Kelley v. Ferraro* and *Sivinski* cases by withholding information and files from Lynn Kelley that belonged to Michael Kelley's estate. Lynn Kelley testified that Brent Buckley withheld the K & F partnership agreement for weeks after Michael Kelley's death while urging her to settle with Ferraro, whom Brent Buckley was secretly counseling without Lynn Kelley's knowledge. Buckley also denied knowledge of the Sivinski agreements even though they were generated on the Buckley Firm's computers. Thus, there is evidence that Brent Buckley and the Buckley firm breached a fiduciary duty to Michael Kelley's estate, as a former client, which would be actionable absent the conspiracy. Therefore, we find that summary judgment on Lynn Kelley's aiding-and-abetting and civil-conspiracy claims was improper.

*Punitive Damages*

{¶ 72} Lynn Kelley argues that summary judgment on her punitive-damage claims was erroneous because there is evidence in the record creating a genuine issue as to whether Brent Buckley and the Buckley firm acted with malice. Courts may award punitive damages in a tort action only upon a finding

that the defendant committed a fraud or insult or that the defendant acted with "actual malice." *Preston v. Murty* (1987), 32 Ohio St.3d 334, 334–335, 512 N.E.2d 1174. The Ohio Supreme Court has defined "actual malice" as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis sic.) Id. at syllabus.

{¶ 73} Here, there is evidence in the record to support Lynn Kelley's allegations that Brent Buckley and the Buckley firm engaged in conflicts of interest and wrongfully concealed documents and information to which Lynn Kelley was entitled for the purpose of assisting Ferraro and K & F, Lynn Kelley's adversaries, and their own interest in continuing a business relationship with K & F. It may be inferred from the evidence that Buckley revealed confidential communications of his former clients, Michael Kelley and Lynn Kelley, to Ferraro for purposes of aiding and abetting Ferraro. Under these facts, we find that there are genuine issues as to whether Buckley acted with malice.

{¶ 74} Therefore, we find that because there are genuine issues of material fact relating to all of Lynn Kelley's claims, summary judgment should not have been granted in Buckley's favor. Accordingly, the first assignment of error is sustained.

### Civ.R. 56(F) Discovery Motion

{¶ 75} In the second assignment of error, Lynn Kelley argues that the trial court erred by not allowing her to obtain discovery related to issues raised in Buckley's two motions for summary judgment. She contends that Buckley obstructed the discovery process and failed to produce relevant discovery. Buckley, on the other hand, argues that much of the requested discovery was privileged.

{¶ 76} The scope of discovery is broad. Civ.R. 26(B)(1) permits discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." The information sought need not be admissible at trial if it appears reasonably calculated to lead to the discovery of admissible evidence. *Roe v. Planned Parenthood S.W. Ohio Region,* 122 Ohio St.3d 399, 2009-Ohio-2973, 912 N.E.2d 61, ¶ 27.

{¶ 77} Pursuant to Civ.R. 56(F), a party opposing a motion for summary judgment may obtain a continuance pursuant to Civ.R. 56(F) by submitting affidavits that state a factual basis and that provide sufficient reasons for the lack of supporting affidavits and the need for additional time to permit affidavits to be obtained or further discovery to be had. *Gates Mills Invest. Co. v. Pepper Pike*

(1978), 59 Ohio App.2d 155, 168–169, 13 O.O.3d 191, 392 N.E.2d 1316. A trial court has discretion to grant or deny a request for a continuance pursuant to Civ.R. 56(F), and its decision will not be overruled absent an abuse of discretion. Id.

{¶ 78} Here, because we have previously determined that the trial court erred in granting summary judgment in favor of Buckley on all claims, this assignment of error is moot. Thus, summary judgment in favor of Brent Buckley and the firm is reversed, and the case is remanded. Additional discovery may be conducted in preparation for trial consistent with Civ.R. 26(B).

Judgment reversed
and cause remanded.

BLACKMON, P.J., and BOYLE, J., concur.

